The 4th District Appellate Court of the State of Illinois has reconvened. The Honorable Robert J. Steigman presiding. Thank you, Mr. Bailiff. Next case this afternoon is our case number 4-23-0703, 0703 Quigg v. Saleem et al. And for the appellant, we have Mr. Berant. Is that correct, sir? Good afternoon, Your Honor. Yes, that's correct. Okay. And for the appellee, we have two different lawyers who will be arguing. Mr. Rosser, you will be arguing on behalf of Ms. Quigg. Is that correct? That's correct, Your Honor. Is my understanding correct? 15 minutes? Correct. Mr. Scott and I have divided our time. Okay. And Mr. Scott, you are going to be arguing on behalf of Ms. Stocker. Is that correct? That's correct, Your Honor. And it will be 5 minutes? Yes, that's correct as well. Okay. Then without any further ado, Mr. Berant, you may proceed, sir. Thank you, Your Honor. May it please the Court, I'd like to focus on two issues today. First, the issue of whether there was a default under the transaction agreements. On that issue, the Circuit Court erred in granting summary judgment because it improperly weighed the evidence and made credibility determinations, which is improper on a summary judgment motion standard. The second issue is Article 9. And on that issue, the Circuit Court erred by granting summary judgment in favor of Ms. Quigg and Ms. Stocker, as well as dismissing Mr. Saleem's counterclaims because Quigg and Stocker enforced their security interests in the shares of the company in violation of Article 9. And so, starting on the first issue of default, I'd like to take the issue of notice up first. Under Section 10 of the promissory notes and Section 9 of the share pledge agreements, it's clear that Quigg and Stocker had to have provided notice of a breach. And there's actually four categories that they had to provide notice of. They had to specify what specific breaches they're alleging, the action required to cure such breach, the date by which such breach must be cured, and that the failure to cure may result in acceleration. Quigg and Stocker have argued that we should look to Section 6 of the promissory note and Section 7a of the share pledge agreement because those don't provide for notice. Those provisions actually just specify what is considered an event of default. In other words, you're in default of X, Y, Z if this happens. It doesn't specify whether or not notice is provided for that default before seeking any kind of remedy. That's when you have to look to those other provisions to find that notice, and that notice provision provides for different categories of notice. The only notice that the appellees can point to is the June 16, 2020 letter from Ms. Quigg, and that letter is insufficient to provide notice under the agreement language, as well as Illinois law that has decided that if there's going to be notice and an opportunity of cure, you have to provide enough for the alleged person in default to actually know what they're curing. What wasn't there? There was no allegation of how much money was due under the promissory note, and so there was no way for Mr. Saleem to know what amount he could pay in order to cure that default. You mean the $300,000 that he admitted taking? That's not under the Section 2A or Section 2B payments. That was an allegation made that Mr. Saleem had taken distributions out of the company, but there had not been any allegations which are the subject of the pleadings here, which are the Section 2B payments not being paid. There's no allegation in that breach letter about those Section 2B payments, and so for, you know, just example, Cathay Bank v. Accenturo, the court looked at various factors to find the notice was insufficient, including failure to provide specific dollar amounts and things like that. Counsel, if I may, with regards to while we're looking at the pledge agreement, paragraph 14 also indicates a default under the agreement or the senior indebtedness would constitute a default under the sales documents, and isn't that the disbursement that Justice DeArmond has just mentioned? And so, Your Honor, you're correct. That provision could be triggered. Number one, it wasn't provided in the notice in terms of how he was supposed to cure that alleged default, and then two, we actually presented evidence that the only reason why he was potentially in default of or the company was in default of the secured lender was because of Ms. Quigg's failure to sign the subordination agreement. Well, the June 14th Bank of Springfield notice, though, to him was without the bank's approval, distributions to stockholders limited to pay income taxes, so that was under the business loan agreement, and so I guess if that's the basis of the default, I think what you're talking about is whether her failure to sign the subordination agreement would be some type of defense to that default. I agree, Your Honor. It appears to me that he's admitted he defaulted on the senior indebtedness, and Bank of Springfield sent him a notice on June 14th. Do you concede that? I do. I believe there was, I believe that's in the record that there was an alleged default by Bank of Springfield. I think you're right that we had asserted in a defense that he could have cured that default if, or the company could have cured that default if Quigg had entered into a subordination agreement, and that would have relieved or prevented, allowed him to cure that default, and this is one of the reasons why the circuit court should have allowed this to proceed to trial, because Mr. Saleem could have prevented that evidence as a defense, not only as a defense, but also as a counterclaim that her failure to sign this subordination agreement would have cleared that default, and her failure to do so actually caused damage, so that's one of the reasons why. But if he defaulted because he took this distribution, and then she sends him notice on June 16th, because it does go on to indicate on the second page of that letter that he returned all disbursements to the company, and it also discusses that his action with the lender being a default and jeopardizing the financial stability, so how is that June 16th notice deficient when it comes to the default to the senior indebtedness? How is the notice itself deficient? I think it doesn't provide an actual amount or what he's actually required to do to cure within a certain time frame without the acceleration. Doesn't it indicate he should return all of the disbursements to the company? Yes, Your Honor, it does. It does specify that, but those distributions, first of all, there was a dispute over those amounts, and second of all, him not knowing exactly which amounts to pay back, I would say would be insufficient under the notice. So I have a question. This is a very complicated case, and I think it'd be helpful to try to separately to try to help understand what's going on. One of the issues about is that the trial court, if I understand correctly, had a summary judgment regarding the issue of whether your client defaulted on the rank of Springfield line of credit, and you're feeling that saying, no, that was improper, but on the genuine issue of material fact, just on that issue for the moment, here's the questions I'd want to ask you. First, is there any genuine issue of material fact that your client defaulted on the rank of Springfield line of credit? Second, that Quake provided the required written notice of that default? And third, that Salim did not hear the default within 30 days of his receiving notice, those three points. If there is some genuine issue of material fact regarding those findings by the trial court, what are they? Yes, your honor. First of all, I would say that I'm sorry, can you hear me? Yes. I would say, first of all, there's a genuine issue of material fact about whether Quake and Stocker should have signed a subordination agreement, essentially alleviating the default under the bank of Springfield loan. So he went out and found the signature bank. He was able to get the subordination agreement signed by Stocker, but Ms. Quake did not sign it. That would have alleviated that default because that signature bank would have covered a line of credit even more than the bank of Springfield was. So I would say that at least in terms of not only an affirmative claim that Mr. Salim should still have against Ms. Quake, but also as a defense to an actual default under the transaction agreements. And actually, your honor, that brings me to my next point, and to Justice Leonard's point as well. Even if there was a default here, it still was error for the court to get rid of Salim's counterclaims because the way that Quake and Stocker enforced their security interests under the transaction agreements was a violation of Article 9. And so Salim should have been allowed to at least present his affirmative counterclaims at the trial court level, and also as a defense to summary judgment because the circuit court went too far in declaring that Quake and Stocker are now essentially the rightful owners of the company when all they had to begin with was a security interest in the shares of the company. And I'm not going to go through all the sections of the UCC Article 9 here, but I want to focus on a couple of them. Number one, Section 601A, talking about what happens after default. And it says that a secured party has the rights provided in certain sections of Article 9, and except as otherwise provided in Section 9602, those allowed by agreement of the parties. And so Quake and Stocker have argued that the agreement of the parties portion of that section means that the parties are free to contract around Article 9 to allow for whatever remedy the parties want. And that's not true because of Section 9602, which is clearly a carve out in 9601, which provides that parties cannot waive or vary the rules stated in various sections. So the sections at issue here being Section 9620, 621, and 622 that deal with the acceptance of the collateral in full satisfaction of the debt. And that is what Quake and Stocker did here, is they took the shares of the company in full satisfaction of the debt. But what they didn't do was follow the steps under Article 9 that allowed them to do that. It is a violation of Article 9, and a party can be liable for violating Article 9 under Section 9625. That was one of Salim's defenses to Quake and Stocker's claims, as well as a counterclaim that was prematurely dismissed. One, the only way that you can actually allow the full satisfaction of a debt is through a writing that's after default. So even if Quake and Stocker are saying, well, there was a writing that allowed for this under UCC Article 9, that writing can only happen after default. The transaction documents obviously were not signed before or were signed before the default. And I just want to note, too, under the Article 9 that the reason for this Article 9 and for this is actually to protect some of his assets. I'm sorry. Can you hear me? Yes, you are fading in and out. So perhaps you can start again, because I think we might have lost some of what you were just saying. Okay. Apologies. Well, it wasn't your fault, so go ahead. We'll talk to the IT people later. Thank you, Your Honor. I just wanted to note that Article 9 and the reason for these unwaivable provisions is to prevent this unjust result that happened, for example, to Salim, because when Salim had acquired the company, he actually merged some of his assets from his former company into this one, creating significant value to the new company. He also paid millions of dollars under the promissory note for a couple of years. And now what's happening under the circuit court's ruling is that not only does Ms. Quake and Ms. Stocker get the benefit that Mr. Salim added through his transfer of assets and an increased value to the company, but they also get the payments that were made under the promissory note. And that's more, significantly more than the debt that was actually owed under the promissory note. And so that's the reason for Article 9 to prevent parties from waiving that provision. Otherwise, debtors are always going to be in risk of essentially losing value that could be triple X or greater through the lender just coming in and taking the collateral in full satisfaction of the debt. And for these reasons, we respectfully ask this court to reverse and vacate the circuit court's orders and remand for further proceedings. And I'd like to reserve my remaining, I believe, four and a half minutes. You have an opportunity to address this in rebuttal for five minutes. Okay. Thank you. So thank you, counsel. Mr. Rosser, on behalf of the appellees, Ms. Quake, you may proceed. Thank you, your honor. May it please the court counsel, the trial court decision should be affirmed and Salim's appeal should be denied. I want to first address the UCC argument and Salim's UCC argument as notice argument because both of these have something in common. But before I go to that, there are four things I just feel compelled to respond to that Salim's counsel put on the record in response to your questions. First of all, the Bank of Springfield amount that was owed is not in dispute. The record clearly shows that the bank told him how much you took. So that and the record is also clear on that. Not only did he not pay that back, he has never made the 2A payments since July. He just stopped doing them. And even after his expert testified about the 2B payments, he never attended even 2B payments. Two, he said he did not get a chance to present his article nine arguments and therefore there was a question of fact and summary judgment. But in fact, he did fully present them. There are not many facts that go to it. I mean, the record was clear what happened. Everything else was argument and there's nothing really more to present. As far as whether this contracting around waiving and the variant, I don't want to overly repeat the brief, but I think we pointed out and I'll make some more comments as to why I believe that this was not a variance or waiver. And lastly, I want to make a quick comment on the unjust result because there's nothing in the record. We pointed out there's nothing in the record about value in here, nothing even in the record that he brought in more business. He put some residual contracts. So that I think, you don't even get to that issue, I don't believe. But if I could turn back, your honors, to addressing the UCC argument and the notice argument of Mr. Saleem. Both of these arguments are asking the court to ignore the plain language and overall context of these agreements, rewrite the party's agreements, give Mr. Saleem more protections than he originally, bargained for, and to take away from Quigg and Stocker the protections they bargained for, which were going to protect them, among other things, the very events that just took place that bring us to the court today. I would like to start off by saying to fully understand Saleem's UCC argument, you first have to view it in the context of the party's agreements. What happened was, and I'm not going to overly repeat, but Saleem induced Quigg and Stocker to give ownership of QEI to him, trust his stewardship of QEI during the time period that he was paying off his note, 10 years, and allow him to pay that off, but without recourse against him, should he default in his payment obligations. In exchange, Saleem agreed, hey, if I default on my payments for more than 30 days, that risk is totally on me, no notice, nothing to cure, which I'll point to in a second when I get to the notice part. You, Quigg and Stocker, you get immediate ownership without the need to have to notify me, give me an opportunity to cure, further action on your part, free and clear of any rights that I have, even if I have impaired the value of the company in the meantime. Counselor, isn't that strict foreclosure though? I'll tell you why there's not strict foreclosure here, Your Honor. Before we move on, strict foreclosure, you can't waive that no matter what your requirements under 602, because 620 says that it's not waivable, correct? That's what it says, but the strict foreclosure requirement, which is the 9601A and the and his rights that are protected that supposedly aren't varied are directly tied to the fact that whether he had more debt and he had no more debt, this was a non-recourse. And what strict foreclosure does, it says, all right, I'm cutting, maybe I'll make a proposal and say, I'll take the collateral and only apply half of the value to your debt, or I'll take it and wipe your debt out, but there's no debt to wipe out because it was a non-recourse. No, he has no further debt obligation, nothing needs to be extinguished. And furthermore, as we argued, Your Honor, there are more specific provisions, which we think apply in this situation. If you look at what... Another type of agreement could be that I give you my collateral and we both walk away. I mean, that is a type of strict foreclosure as well. Well, no, that is... I mean, I guess the UCC is a little highly technical on this and I don't want to say that I'm like the treatise writer in UCC, but in that case, that's a debtor who goes, fine, end the story, call it what you want, I consent, end of whatever. Without you having to go through the strict foreclosure process, if that was applicable, we say it's not because it says, you give me a proposal of how much of my collateral you're going to apply to the debt. Well, there's nothing to apply because non-recourse, he's a walkaway. He can basically, as he did, take money, not tell us any about the profits, the net profits, impair the value with causing the bank to do for $2 million. He goes, fine, end of story. And he wasn't reaching in his pocket to pay. This process was set up that he would take... The company would generate funds. He would take distributions to pay it. And then if there was profits, which he had the obligation to provide the financials, he had the obligation to tell, is there or is there not a profit? And he didn't do that. But once his attorney did, it was objective because it wasn't clear. So there's not a need. This isn't a foreclosure need or a consent. This is, as we argued, there is, we believe, a legitimate, and it was negotiated by him, a sophisticated businessman with advice of counsel, an additional alternative contractual remedy. And he is now saying to you, look, I made these promises. I wrote these agreements. I agreed to do this. And I'm telling you now, I didn't mean it. UCC, you should excuse me from complying with my own words and promises and take away the given the significant risk that Quiggin Stocker had when they took this on, okay? And even today, he persists of having no default. Yet we saw the testimony of QEI's accountant, Mr. Murphy, that he called, that even in the beginning, Mr. Murphy was saying, well, not to the fault. And finally, when asked the questions, he admitted that PPP for a given loan is income. He even reported it in compilation statements as income. He gave them to Mr. Salim. And no matter whether it's cash or accrual, he was in default. And even as of today, even in his briefs, he persists saying, I'm not in default. So he's asking to get excused from this. And he's asking you to give back control of his company to him, even though he has, his stewardship has been, we say, terrible. And I would suggest that Illinois jurisprudence is courts don't rewrite bargains struck between two sophisticated parties. And public policy strongly favors giving effect to commercial parties of equal bargaining power of how they decide to allocate the risk of loss. Salim is asking you to focus only on the strict foreclosure, the 9601 and 620, 601A, 620. But like I said, not only is there no debt to foreclose, there are more specific provisions. And his non-waverable rights were directly tied to the fact that he would have an existing note obligation. And that's not the case. If you accept, think of this, if you accept his position under 96-20, which gets triggered by the 9601A, okay, you get, I would suggest, an absurd result. And that absurd result is Salim could say, oh, I object to you, Quigstocker, getting the collateral, and I'm going to force something. And yep, and if there's a surplus, which we have no idea whether there would be a surplus, then I get the surplus. But if I force, I object, and I force this to go out there, and we find out whether or not there is a surplus, and if there is no surplus, and because the collateral value is impaired, or it doesn't generate because of the nature of this stock, as we pointed out, we think it's a very limited kind of market, doesn't generate sufficient proceeds equal to Salim's debt. Quig and Stocker, they have no rights to pursue him for deficiency. So he, if any unjust result here, he benefits. But we have nothing on the record, but we never get to that point, because the court, we think, properly looked at and said, yes, this is a legitimate alternative remedy, not foreclosed by the language, or even the reasons behind the UCC provisions. 9601A is one. 9601B, the Secured Party in Possession, which we pointed out, what is, it's crazy the way the UCC works, but then 9601C says, these are not mutually exclusive. You can exercise both of them simultaneously. So ask yourself, how can you have a UCC section in which a debtor can't waive notice prior to exception of the collateral, but simultaneously and cumulatively apply a UCC section that allows the Secured Party to use the collateral to the extent agreed by the debtor with no notice required in the UCC provisions. The reconciliation I would suggest is that 601A and 620 only apply where the Secured Party doesn't already possess the collateral. In other words, the provisions that we were citing, we believe would, if you have to go to them, are the controlling provisions. There was a point made, and this unjust result, I think, is also, I take it euphemistically of some of the points where it was saying, well, we were acting in, Quigley was acting in bad faith and bad motivation. But contrary to those assertions, there's nothing in the record that evidences that Quigley or Stocker were motivated to capitalize on any increased value in QEI, which is what is being hinted at by the argument made to you today. For if anything, I would suggest all the facts in the record contradict this because what they're doing, because at that time, Quigley and Stocker, when the time they acted, Saleem had caused a default on the $2 million bank loan, which the record clearly shows this company was dependent. The testimony was it needed to make payroll. He told Halsey in an email that said, hey, the growth was because we had the benefit of your line of credit. And now because of the default, as we pointed out, what happened is the collateral that Bank of Springfield has, which are the accounts receivable, they all were at immediate risk. So if anything, Quigley and Stocker weren't acting to try to cause some unjust result to Mr. Saleem. They were reacting to the terrible situation that they found themselves in. And we also suggested, because we've talked about notice here today, that we've argued that Saleem's, at the end of the day, Quigley's lawsuit puts Saleem on notice. He gets the notice that says, OK, I, you're in the fault. You didn't make the 2B payments. You need to cure them. And the remedy is my stock. And he had a chance to litigate it because the judge, because Judge Madonia actually said, I need to hear. I'm not going to even. It happens that time, I think, with a preliminary injunction, you actually get to the beginning. He said after the first hearing, I need to hear more. I need to hear detail about this. And that's what he heard. He heard a lot of evidence from everybody. And we gave you the quote, I believe, from Saleem's own prior filings where he, in the trial court, I think it was, where he said, I put our babies in this court. I can't remember. He said, you know, I put on the evidence of my counterclaims in the hearing. I mean, he said, I litigated this. He had the full chance of doing it. The trial court heard it. The evidentiary record was clear. There's nothing that contradicted the BOS default, nothing that contradicted the 2B default, even by his own expert. The language, I would suggest, I'll get to notice in a second. I hope I'm not running too much out of time here. So what is summary judgment? Summary judgment is if you have no genuine issue of material fact, you don't get the trial, even if there may be otherwise the facts. And the case law that Saleem points to, I would suggest, there are no non-recourse, those are not non-recourse cases. Isn't there a problem in this record with regard to some of the summary judgment issues with the trial court receiving and weighing evidence as opposed to just simply making a determination that there is no genuine issue of material fact? Judge, no, for the following reason. If you look at what Mr. Saleem argued, was what was weighed, okay? He said there was a material fact of whether all the payments were made to Quigley and Socker on a promissory note. And we know from his own expert, they weren't. Determining the, he said, question of fact, determining the accounting method. But the two experts said, whether you do cash or accrual, it doesn't matter. You get to the same result. So that's not a material fact. He said, there's a question of fact of whether he was in default and providing financial statements to Quigley and Socker, because he said they had access to all this stuff. They could have done it themselves. But the record was, they're not accountants. He was obligated to provide a QEI account and prepared financial. And he admitted in answer to one of my questions, and we quoted it, that he said, I know I'm not excused from doing it just because they had access to it. And the other part, he made a, there was a double argument because he said, well, they have strict compliance on that. So I don't think there was any genuine issue of material fact, Your Honor, when it came to the summary judgment. And I think that's what Judge Madonia, who said, I took into consideration everything. I reviewed all the documents. There's nothing there and there's nothing pointed out. They don't argue and point to any legitimate or any kind of credibility thing. They don't even claim that there's an inference that needs to be taken. And as I said, the material facts that they say, they're not really material facts. So, and if I have one second on the notice, if I could, the thing about the notice is, if you accept Saleem's argument, he says, you have to ignore, you have to ignore all the four provisions that exist in my agreement that I agreed to and look at Section 9 and Section 10. He said, oops, I'm out of time. Your time is up. Thank you, counsel. Thank you. Mr. Scott, on behalf of the FLE Stocker, you may proceed, sir. Thank you, Your Honor. May it please the court and counsel. As the court said, I represent Rebecca Stocker. She was the 10% minority shareholder of QEI, who joined with Lori Quigg, the 90% shareholder, to sell their shares to Mohamed Saleem in 2019, January 2019. They also exercised their right on Saleem default under the note to, it was a contracted option they had to revest themselves with the stock. Since these were non-recourse notes, that was an election they took instead of taking the Article 9 option to sell the stock, which, as Mr. Wasser said, would lead to an absurd result or very impractical, impossible situation. We did point out in our brief, we adopted the brief articles of Ms. Quigg because we were in substantially her same position. We did point out that Saleem entirely failed to respond in any way or answer the counterclaim that we filed on behalf of Ms. Stocker. Under 2-610, counterclaims are to be treated the same as a complaint, and he therefore has procedurally admitted the material facts of our complaint. Those include, among other things, his default, and I think his default is pretty well established in the case anyway. He failed to provide the financial statements necessary to calculate the Section 2B mandatory payments. He failed to pay the 2B mandatory payments. It's alleged in our counterclaim that no notice was required after such payment defaults, specifically that is provided in Section 7A of the pledge agreements where it says except where payments under the note are not made, then there's no notice being required. Also, the fact that he caused the default under the BOS line of credit by his excessive share pledge agreements, but also exposing QEI to set off by Bank of Springfield because it held the security interest in the accounts receivable and other assets of QEI. Mr. Saleem, through his attorneys, pointed to two cases asking for a liberal construction of Section 2-610 of the Civil Practice Act to relieve his failure to file any response of pleading. One was the first district case, Crawford County Oil v. Wager, and then a fourth district case, Grant v. State of Illinois. In both of those cases, we have the defendants filing motions to dismiss, followed up by summary judgment. While they were fact-specific, even in the Crawford case, the court allowed the defendant in that case to read in his answer during the proceedings to the complaint in the case. Notably, the court in Grant v. State of Illinois said that a motion to dismiss brought pursuant to 2-615, which it was in that case, attacked the legal sufficiency of the complaint. And in both cases cited by Saleem, we have that timely response of pleading in the form of motions to dismiss. And in our case, we had nothing at all filed, as the trial court found. He totally ignored the allegations of Stocker's cross-claim throughout all the proceedings. He didn't even respond to Stocker's motion for summary judgment or motion to supplement the court's May 9, 2023 order. And then his participation in the court proceedings, which he claimed is sufficient to provide his response, was not to defend against Stocker's counterclaim, but was to pursue his own cross-claim for temporary restraining order and preliminary injunction. And in that cross-claim and preliminary injunction, Stocker was not even named as a party. Um, basically, this involves statutory construction. I think the court well knows from Supreme Court cases and others that the fundamental objective of construction is to give effect to the intent of the legislature. And the best indicator of that is the plain meaning of the words. Your time is up, Mr. Scott. Oh, I'm sorry. Thank you for your argument. Mr. Burrant, on behalf of the appellant, you may make a rebuttal argument. Thank you, Your Honor. Uh, I believe I'll address, um, Ms. Stocker's argument by opposing counsel first regarding the admission of various allegations. Uh, I would just point to 735 ILCS 52-1005, which is the Civil Procedure Code, which is allows on summary judgment, uh, only if the pleadings, depositions, admissions on files, affidavits show that there is no genuine issue of material fact. And I think it's clear the parties were clearly under dispute here in the trial court. Um, Salim presented a lot of evidence in response to summary judgment. Um, these evidentiary issues were litigated extensively, um, and there was no surprise due to Ms. Stocker that, um, these issues were obviously contested. And Ms. Stocker claims too, um, that she sits in the same shoes as, as Ms. Quigg, other than, you know, the amounts of, of interest in the company as well as the payments. Uh, her allegations aren't any different. And it's, uh, you know, clear that, that Salim had answered Quigg's complaint, um, denied those allegations and filed counterclaims to them. And then I would just point back to, uh, the Crawford argument that, um, in, in the Crawford case, um, that talked about, um, the, the intent to liberally construe, um, these disputes to, to get to a fair and just result, um, on the merits, not, um, through, uh, various, uh, technicalities. So I, I'll move on from that one. Uh, I, I want to point out that, um, this, this was not a full evidentiary record as well. Um, this was on summary judgment that was, um, really only litigated after a preliminary injunction hearing. Yes, there was discovery, um, how much more discovery would be needed. Would obviously be, be a question, um, to, to, to decide after this and, and, and have a certain court rules, but there absolutely would be discovery remaining. And so this was not a full trial on the merits. Uh, this was on summary judgment. The standard, um, is, is not whether, uh, they proved the case that all we had to do was submit a, a genuine issue of material fact. And, and just for example, on the issue of whether it was cash, um, or accrual accounting for the company, Saleem had testified that it was cash basis accounting for the company. The only way to not find that a genuine issue of material fact is to not credit that testimony, um, at all. And that's, that's improper on summary judgment. Um, in terms of article nine, uh, I think, I think Justice Lannert's right. This, this was strict foreclosure. The cases that we cite are all about strict foreclosure and what you have to do, um, to, uh, proceed with strict foreclosure under, uh, section nine, um, dash six two zero. I'll point out that there's nothing in article nine at all that talks about recourse versus non-recourse loans and whether or not that changes what's required under article nine. Um, what Quig had to do, well, if, if Quig wanted to proceed with, with strict foreclosure, that needed to be in writing and agreed to by Saleem, uh, and that wasn't. Um, and instead what Quig had to do, uh, was operate under the other remedies either in the agreement or, uh, article nine, and that would be disposed of the collateral. Uh, she could have had a UCC sale of this collateral, the shares of the company, they happen all the time. Um, and if she wanted to purchase those shares of the company, she was free to do so at a private, uh, or public sale of the collateral. Um, and she didn't do that. Um, and what would have happened if she did is then Saleem would be entitled, uh, to the proceeds from that sale in order to make himself whole rather than, um, losing whatever multiple of, of the company value is compared to what was left on the debt. And also, if I may, other than Mr. Saleem's testimony, is there any evidence in the record to contradict Ms. Quig's assertion that he took the unauthorized distributions or his own statements that he made in those emails to Mr. Halsney? And just to clarify the question, you're just referring to the potential default under the Bank of Springfield issue?  Uh, I, not that I can think of off, off the top of my head, I will say this though, I just, I just pulled up the, um, notice that was sent, uh, from Quig on this point. And it wasn't that Saleem was, um, prohibited from taking distributions. He was allowed to take distributions for salary and necessary, uh, for estimated tax payments. And I would argue that that by itself was a question of fact in terms of what, what was appropriate for salary and necessary tax payments, rather than just being the, all the distributions in general, um, were improper. Professor Slater, do you have anything further you wish to ask? I do not. Thank you. Thank you, counsel. Then, uh, the arguments have been concluded and, uh, the court will take this matter under advisement and, uh, stand at recess.